FILED
United States Court of Appeals
Tenth Circuit

May 29, 2012

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

FOR THE TENTH CIRCUIT

---

RUSTAM MUSSAYEVICH KAITOV,

Petitioner,

v.

ERIC H. HOLDER, JR., United States
Attorney General,

Respondent.

No. 10-9587
(Petition for Review)

---

## ORDER AND JUDGMENT[*]

---

Before **MURPHY**, **ANDERSON**, and **HARTZ**, Circuit Judges.

---

Petitioner Rustam Mussayevich Kaitov seeks review of a final order of

removal by the Board of Immigration Appeals (BIA), which affirmed the decision

of the Immigration Judge (IJ) denying Kaitov's application for asylum,

withholding of removal, and relief under the Convention Against Torture (CAT).

We exercise jurisdiction under 8 U.S.C. § 1252(a)(1) and deny the petition.

---

[*]    After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist the determination of
this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is
therefore ordered submitted without oral argument. This order and judgment is
not binding precedent, except under the doctrines of law of the case, res judicata,
and collateral estoppel. It may be cited, however, for its persuasive value
consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

I.

Kaitov is a native of the former USSR and a citizen of the Russian Federation.  He entered the United States in June 2005 on a four-month student visa.  After overstaying his visa, he filed a timely application for asylum and withholding of removal, claiming that he had been persecuted in Russia on account of his Karachi[1] ethnicity and his political opinions.[2]

In proceedings before the IJ in December 2007, Kaitov conceded that he was removable but sought relief from removal.  The IJ scheduled the matter for a final hearing in January 2009 and twice told Kaitov and his counsel that all documentary evidence had to be provided to the IJ and the government at least 15 days before the hearing.

At the final hearing in January 2009, Kaitov testified and submitted several documents in support of his claims.  Three of the documents had not been provided to the IJ or the government in advance of the hearing, however, and the IJ refused to admit them into evidence.  At the conclusion of the hearing, the IJ found that he had not established his eligibility for relief because he had failed to

---

[1]     Also spelled "Karachay," the term means "a person from [the] Caucas[u]s." Admin. R at 182.

[2]     On his asylum application, Kaitov also checked the box for persecution on account of "membership in a particular social group," Admin. R. at 175, but he made no arguments before the IJ or the BIA relating to persecution on this ground, nor does he make any before this court.

corroborate the central facts of his claims. The IJ therefore ordered Kaitov removed to Russia.

Kaitov appealed the IJ's decision to the BIA. In an order affirming the IJ's decision, a single member of the BIA concluded that certain of Kaitov's allegations did not rise to the level of persecution, that it was reasonable for the IJ to expect him to corroborate his claims, and that he had failed to do so. The BIA therefore affirmed the IJ's decision. Proceeding pro se, Kaitov seeks review of the BIA's order.

II.

To establish his eligibility for asylum, Kaitov had to show that he "suffered past persecution or has a well-founded fear of [future] persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." *Tulengkey v. Gonzales*, 425 F.3d 1277, 1280 (10th Cir. 2005) (footnote omitted) (internal quotation marks omitted). "Persecution is the infliction of suffering or harm upon those who differ (in race, religion, or political opinion) in a way regarded as offensive, and requires more than just restrictions or threats to life and liberty." *Id.* (internal quotation marks omitted). Kaitov had to meet an even higher burden to establish his right to withholding of removal: he had to show "a clear probability of persecution because of his race, religion, nationality, membership in a particular social group, or political opinion." *Zhi Wei Pang v.*

*Holder*, 665 F.3d 1226, 1233 (10th Cir. 2012) (internal quotation marks omitted). And to be eligible for CAT relief, he had to show that "it is more likely than not that he . . . would be tortured if removed to the proposed country of removal." *Id.* at 1233-34 (internal quotation marks omitted).

### III.

Kaitov testified briefly about the discrimination he had encountered in school since childhood because of his Karachi ethnicity, but most of his testimony focused on his experiences as a university student. He testified that he joined an anti-military student group called the ASG in 2003. The 20-member group's primary goals were to educate the public about legal alternatives to military service and to solicit aid for Chechen refugees. Kaitov said that he had attended the group's monthly meetings, was active in soliciting aid for Chechen refugees, and distributed flyers at two demonstrations organized by the ASG.

The first demonstration was held in December 2003[3] and was attended by about 200 people. Kaitov distributed flyers at the demonstration until the police arrived to break it up. They arrested some of the demonstrators and ASG members who were distributing flyers, but Kaitov evaded arrest. The second demonstration was held in October 2004 and was attended by about 150 people.

---

[3] According to Kaitov's affidavit, it was held on the ninth anniversary of the start of the war in Chechnya.

Kaitov gave a short speech at the beginning of the demonstration and also distributed flyers. When the police arrived to break up the demonstration, he was arrested and taken to the police station.

He was interrogated by two officers, who wanted him to give them a list of ASG members and to act as a police informant. When he refused, he was beaten and jailed. He was held for two days without food or water and then questioned again. When he still refused to cooperate, he was struck in the head with a gun, causing him to bleed heavily. The police released him with a warning that they would summon him again, and if he still refused to cooperate, they would "finish" him. Admin. R. at 127.

Kaitov went to the hospital that night to be treated for his injuries, and the next day he filed a complaint with the prosecutor. Three days later he began receiving threatening phone calls, which continued for some time. Kaitov was undeterred, however, and continued his activities with the ASG, including visiting the Chechen refugee camp. He was stopped twice on his way to the refugee camp by Kazaks,[4] who questioned him, searched his car, harassed and threatened him, and ultimately turned him away.

In addition to his political activities, Kaitov taught dance to university students and started a dance group that performed at university concerts and other

---

[4] Kaitov stated that the Kazaks (Cossacks) were permitted to carry weapons and to stop people and ask for their documents. Their goal, he said, was to rid Russia of ethnic minorities.

public events. His dance group organized in February 2005 a concert at the university that highlighted the songs and dances of ethnic Russians. About 700 people attended the concert. During one of the dances, about 30 skinheads broke in and started throwing bottles at the stage, destroying things, and beating whomever they could. Two skinheads grabbed Kaitov and beat him, yelling "Russia for Russians." Admin R. at 135-36. When the police arrived to break up the melee, Kaitov saw one of his interrogators among them. Recognizing Kaitov, the officer told him that this was just the beginning of his torture, and they would find a way to put him behind bars and finish him because he had refused to cooperate. Some of Kaitov's friends found him lying on the floor and took him to the hospital.

In April 2005 Kaitov was summoned to appear at the police station to provide testimony in a case. Rather than obey the subpoena, he left his family's apartment and went to stay with a friend. In May two policemen came to the apartment looking for him. His sister answered the door and told them he was not there, but they barged in and searched the apartment anyway. When Kaitov found out, he decided that it was useless to keep hiding and he should leave the country. He found a program that would allow him to study abroad and left for the United States in June.

Kaitov presented some documentary evidence to support his claims. In addition to his birth certificate and student ID, he submitted a student certificate

from the Ministry of Education and some photographs of his dance group. He also submitted a letter from his father, dated less than a month before the hearing, that discussed discrimination against ethnic minorities in Russia and described very generally the events to which Kaitov had testified. Further, Kaitov provided some newspaper articles and other reports that described the general conditions in Russia, including the discrimination against ethnic minorities and the rise of nationalism and violence by skinheads.

To support his testimony about the ASG, Kaitov submitted a copy of an ASG webpage on the internet, entitled "About Us." The webpage described the goals and activities of the ASG, which was started in 1999. It also gave the name of the ASG leader, who Kaitov said was the leader when he was a member, and a telephone number and email address to contact the group. The webpage identified seven ASG members whom it thanked for their contributions to the organization, including "conducting protests and rallies," Admin. R. at 221. Kaitov was not among those listed. He testified that the people mentioned on the webpage were the most active members of the group and had been with the ASG since its inception.

Kaitov did not, however, produce statements from any ASG members about his own activities. He said that he was not able to contact anyone who was in the ASG while he was a student because they had all left the university and moved away. He also said that there were no newspaper accounts of the demonstrations,

and he did not have a copy of the complaint he filed with the prosecutor following his arrest because he was not given one at the time and his parents were not able to get one later. Kaitov testified that he did contact some of his friends who had been at the concert in February 2005 and had taken him to the hospital, but they were afraid that they might have problems if they gave him a statement. He said that he did not ask his sister to provide a statement about the police search of their home because he was afraid something might happen to her.

Kaitov also submitted a hospital statement describing his treatment in October 2004, a hospital statement describing his treatment in February 2005, and a copy of the subpoena he received in April 2005. But he did not submit these documents in advance of the hearing, as required by the IJ. He explained that he had not been able to submit them earlier because his parents had only recently found them in one of his textbooks and emailed them to him. The IJ did not accept this as a valid excuse for the untimely submission. He noted that Kaitov was an educated man, knew that the documents were important and needed to be submitted to the government and the IJ, and had over 13 months since the last hearing and almost four years since he entered the country to collect his evidence. The IJ accepted the documents for inclusion in the record, but refused to admit them into evidence.

The IJ found that Kaitov's testimony was not sufficient to establish his eligibility for asylum without corroboration and that his corroboration was

insufficient to meet his burden of proof. *See, e.g., In re S-M-J-*, 21 I. & N. Dec. 722, 725-26 (BIA 1997) (applicant's failure to corroborate material facts central to his claim "can lead to a finding that an applicant has failed to meet [his] burden of proof"). In particular, the IJ said that Kaitov failed to produce evidence from anyone in the ASG showing that he was a member of the ASG or that he participated in demonstrations, and his name was not among the members listed on the ASG webpage he provided. He failed to provide any newspaper accounts of the demonstrations where people were arrested, any police reports, or a copy of the complaint he filed with the prosecutor's office. Kaitov's production of the hospital records and the subpoena was untimely and, in any event, the medical records did not indicate how he got hurt and the subpoena did not provide any information about the case on which his testimony was sought. The IJ concluded that Kaitov was not eligible for either asylum or withholding of removal and that there was no support for CAT relief because there was no evidence Kaitov would be tortured if he returned to Russia.

IV.

In his petition for review, Kaitov argues that the BIA erred in affirming the IJ's decision because (1) his evidence showed that he suffered past persecution on account of his ethnicity and political opinion and that he has a well-founded fear of future persecution; (2) the IJ and BIA based their adverse credibility

determination on speculation, conjecture, and misapplication of the law; (3) the IJ and the BIA erred in concluding that he needed to corroborate otherwise credible testimony and that he failed to do so; (4) the IJ and the BIA violated his right to due process by refusing to admit the three untimely documents and the IJ failed to determine whether good cause excused their untimeliness; (5) the IJ erred in shifting the burden of proof to him to establish that he could not relocate within Russia to escape future persecution; and (6) the IJ and the BIA erred as a matter of law in denying withholding of removal or relief under the CAT.

In reviewing the decision of a single BIA-member issued under 8 C.F.R. § 1003.1(e)(5), "we will not affirm on grounds raised in the IJ decision unless they are relied upon by the BIA in its affirmance." *Uanreroro v. Gonzales*, 443 F.3d 1197, 1204 (10th Cir. 2006). We may, however, consult the IJ's decision in an effort to understand the grounds upon which the BIA relied. *See id.* We review any questions of law de novo, and we look to see if the agency's findings of fact are supported by substantial evidence. *See Ritonga v. Holder*, 633 F.3d 971, 974 (10th Cir. 2011). The agency's "findings of fact are conclusive unless any reasonable adjudicator would be compelled to conclude to the contrary." 8 U.S.C. § 1252(b)(4)(B). "In this circuit, the determination whether an alien has demonstrated persecution is a question of fact." *Ritonga*, 633 F.3d at 974 (alteration omitted) (internal quotation marks omitted).

Kaitov's first argument essentially asks us to reweigh the evidence and determine that he made an adequate showing of both past persecution and a well-founded fear of future persecution. But we cannot reweigh the evidence and decide for ourselves whether it is sufficient to satisfy Kaitov's burden of proof. *See Sidabutar v. Gonzales*, 503 F.3d 1116, 1125 (10th Cir. 2007); *Woldemeskel v. I.N.S.*, 257 F.3d 1185, 1189 (10th Cir. 2001). We may reverse only if the evidence not only *supports* a finding of persecution, but would *compel* any reasonable factfinder to conclude that he established the requisite persecution. *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 481 & n.1 (1992). The evidence does not meet this exacting standard.

Kaitov also argues that the IJ and BIA erred in making an adverse credibility determination. But the IJ simply found that Kaitov's testimony was not sufficient to stand on its own without corroboration, and the BIA agreed that it was reasonable for the IJ to expect Kaitov to corroborate his testimony. The asylum statute provides that "[w]here the trier of fact determines that the applicant should provide evidence that corroborates otherwise credible testimony, such evidence must be provided unless the applicant does not have the evidence and cannot reasonably obtain the evidence." 8 U.S.C. § 1158(b)(1)(B)(ii). Thus, the IJ may require the applicant to corroborate his testimony even if it is generally credible. The failure to present corroboration that should be available can in itself cast a cloud on the applicant's credibility.

Kaitov complains that neither the IJ nor the BIA explained why his testimony, standing alone, was not sufficient to establish his eligibility for asylum, but he points to no law in this circuit requiring them to do so. "[A]n asylum applicant should provide documentary support for material facts which are central to his or her claim and easily subject to verification . . . ." *In re S-M-J-*, 21 I. & N. Dec. at 725. "The introduction of such evidence is not purely an option with the asylum applicant . . . ." *In re M-D-*, 21 I. & N. Dec. 1180, 1182 (BIA 1998) (internal quotation marks omitted). The IJ did not err in expecting Kaitov to corroborate the material facts central to his claims, and the BIA did not err in concluding that the IJ's expectation was reasonable.

Kaitov argues that the IJ and BIA erred in determining that the documentary evidence he produced was insufficient, because he explained why he could not produce other evidence[5] and the government did not show that other evidence was available. But the burden is not on the government to show what evidence the asylum applicant could have produced; the burden is on the applicant to produce evidence that should reasonably be available or provide an adequate

---

[5] Kaitov complains that the IJ did not question him about the corroborating evidence that the IJ expected to see and ask why he did not produce it. But both his counsel and the government's counsel questioned him about why he did not produce a wide variety of corroborating evidence, and he was given an opportunity to explain the absence on the record. *See In re S-M-J-*, 21 I. & N. Dec. at 724 (applicant who fails to produce corroborating evidence must explain why it is unavailable, and IJ must ensure that explanation is in the record). There was no need for the IJ to question him further.

explanation for his failure to do so, *see, e.g., id.* at 1182-83; *In re S-M-J-*, 21 I. & N. Dec. at 724.

Kaitov argues more specifically that he gave reasonable explanations why he did not provide corroboration from his sister or the ASG and that the IJ and BIA did not give specific or cogent reasons for rejecting those explanations. As to the first point, neither the IJ nor the BIA relied on Kaitov's failure to provide corroborating evidence from his sister in concluding that he failed to meet his burden of proof, so any failure to address the validity of Kaitov's explanation is of no moment. As to the second, the IJ did explain why he rejected Kaitov's explanation for his failure to produce corroboration of his activities with the ASG, and the BIA concurred that Kaitov did not reasonably explain his failure to produce available corroborative evidence. We cannot reverse this determination unless "a reasonable trier of fact [would be] compelled to conclude that such corroborating evidence was unavailable." *Id.* § 1252(b)(4).

Given the level of Kaitov's alleged participation in what was a relatively small political group, coupled with the fact that the ASG webpage not only identified the same person as the group's leader who was the leader when Kaitov was a member, but provided contact information for the ASG, we cannot say that any reasonable trier of fact would be compelled to conclude that no evidence was available from another ASG member to corroborate Kaitov's activities in the ASG, including his participation in the demonstrations and his subsequent arrest

-13-

and beating. Nor can we say that any reasonable trier of fact would be compelled to conclude that no evidence was available from any other source corroborating the existence of two sizeable demonstrations–one of which was held on the anniversary of the start of the Chechen war–that were broken up by the police, who arrested demonstrators.

Kaitov also argues that the IJ violated his right to due process by excluding the three documents that he submitted late. But "[a]n alien in removal proceedings is entitled only to the Fifth Amendment guarantee of fundamental fairness. Therefore, when facing removal, aliens are entitled only to procedural due process, which provides the opportunity to be heard at a meaningful time and in a meaningful manner." *Schroeck v. Gonzales*, 429 F.3d 947, 952 (10th Cir. 2005) (citation omitted) (internal quotation marks omitted). The record shows that Kaitov was given all the process he was due.

The IJ put Kaitov on notice more than a year before the final hearing of the need to produce all documentary evidence at least 15 days in advance of the hearing. The Immigration Court Practice Manual contains a like requirement.[6] U.S. Dep't of Justice, Exec. Office for Immig. Rev., Immigration Court Practice Manual, § 3.1(b)(ii)(A) (2008). A party who wishes an IJ to accept a late filing

---

[6] The Immigration Court Practice Manual is "binding on parties who appear before the Immigration Courts, unless the Immigration Judge directs otherwise in a particular case." U.S. Dep't of Justice, Exec. Office for Immig. Rev., Immigration Court Practice Manual, Intro. (2008).

-14-

must "explain the reasons for the late filing and show good cause for acceptance of the filing." *Id.* § 3.1(d)(iii). The IJ "retains the authority to determine how to treat an untimely filing," and when the untimely filing is an exhibit, the IJ may refuse to enter it into evidence. *Id.* § 3.1(d)(ii), (iii); *see also* 8 C.F.R. § 1003.31(c) ("If an application or document is not filed within the time set by the Immigration Judge, the opportunity to file that application or document shall be deemed waived."). An important reason for requiring that documents be submitted well before the hearing is to enable government authorities to check their authenticity.

The record belies Kaitov's contention that the IJ did not determine whether good cause excused his untimeliness. Although the IJ did not use the term "good cause," he did discuss why Kaitov's explanation was not adequate to excuse his untimeliness. And the BIA agreed, noting that the documents had been in existence since 2004 and 2005 and concluding that the IJ reasonably rejected Kaitov's explanation for their late submission. Neither the IJ nor the BIA violated Kaitov's right to due process.

In his fifth claim for relief, Kaitov argues that the IJ erred by faulting him for not establishing that he could not relocate elsewhere in Russia to avoid persecution. Kaitov is correct that if an asylum applicant establishes that he has suffered past persecution, a presumption arises that his fear of future persecution is well-founded, and the government bears the burden of rebutting that

presumption by showing that the applicant can avoid future persecution by relocating to another part of the country. *See* 8 C.F.R. § 1208.13(b)(1). But regardless of the soundness of the IJ's reasoning on this point, it is clear the BIA did not rely on Kaitov's ability to relocate in its decision upholding the order of removal. And our review does not extend to any reasoning of the IJ that was not expressly or implicitly incorporated in the BIA's decision. *See Sarr v. Gonzales*, 474 F.3d 783, 790 (10th Cir. 2007).

Finally, Kaitov argues that the IJ and BIA erred as a matter of law in rejecting his requests for withholding of removal and relief under the CAT. His arguments, however, do not focus on any legal error by the IJ or the BIA; they focus only on the sufficiency of his evidence. Having properly determined that he did not meet his burden of proof for asylum, neither the IJ nor the BIA erred in concluding that Kaitov did not meet the higher burdens of proof for withholding of removal or relief under the CAT. *See, e.g., Zhi Wei Pang*, 665 F.3d at 1234.

The petition for review is DENIED.

Entered for the Court

Harris L Hartz
Circuit Judge

-16-